84 P.3d 489

In the Matter of MARICOPA COUNTY SUPERIOR COURT NO. MH 2003–000058.

No. 1 CA–MH 03–0005.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 17, 2004.

Richard M. Romley, Maricopa County Attorney By Stephen E. Silverman, Deputy County Attorney, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Lawrence S. Matthew, Deputy Public Defender, Mesa, Attorneys for Appellant.

## OPINION

BARKER, Judge.

¶ 1 We address in this appeal one question: does a physician with a "one year training permit" qualify as a "licensed physician" under Arizona Revised Statutes ("A.R.S.") section 36–501(11)(a) (2003) for purposes of conducting or supervising a psychiatric evaluation in a civil commitment proceeding? Our answer is no.

*I.*

¶ 2 On January 15, 2003, Dr. Navid Ayub filed a petition for court-ordered treatment of appellant on the grounds that appellant was persistently or acutely disabled. The petition was supported by affidavits signed by Dr. Ayub and Dr. Aida Lacevic. Dr. Ayub is a medical doctor who is authorized to practice in Arizona under a "one year training permit" issued pursuant to A.R.S. § 32–1432.03 (2002). Dr. Lacevic was a resident who was supervised in her work by Dr. Jose Espinoza. Dr. Espinoza, like Dr. Ayub, was

also authorized to practice in Arizona under a "one year training permit."

¶ 3 Because Dr. Ayub's and Dr. Espinoza's authority to practice is based only on a training permit, appellant argued to the trial court that they do not fall within the definition of "licensed physicians" and moved the trial court to dismiss the petition on those grounds. At an evidentiary hearing it was established that Drs. Ayub and Espinoza have finished their psychiatric residencies, but have not completed part three of the United States Medical License Examination. Thus, they do not qualify for licenses under A.R.S. §§ 32–1422 to –1426 (2002). The record discloses that Dr. Espinoza began his residency in 1994 and completed it in 1997. He submitted affidavits for civil commitments all through his residency and then from 1999 to the present. He has received one-year permits to practice for at least four years, since July of 1999. Dr. Ayub completed his residency in 1999 and has received at least two one-year permits, beginning in January of 2002.

¶ 4 Also at the hearing, Michelle Semenjuk, the licensing administrator of the Arizona Medical Board, testified that a "doctor of medicine is a person holding a license, registration or permit to practice medicine pursuant to the chapters of the statutes." She also testified that the only difference between those that have a permit under A.R.S. § 32–1432.03 and those that have a "regular" license is that "they cannot work independently without a license." She construed this to mean that "[t]hey couldn't go out and just open up a private practice." Later, when asked if it was more accurate to say that they are licensed physicians or that they are physicians with a permit, she answered "physicians with a permit."

¶ 5 At the conclusion of the evidentiary hearing, the trial court denied appellant's motion to dismiss. The court determined that the training permit under which the medical doctors were working qualified as a form of license which in turn qualified them as "licensed physicians" under A.R.S. § 36–501(11)(a).

¶ 6 On the merits of the petition, the trial court found that appellant was persistently or acutely disabled and ordered that she undergo inpatient and outpatient treatment until she is no longer persistently or acutely disabled or is otherwise discharged in accordance with the law for a period not to exceed one year. The court based its findings in part on the testimony and affidavits of Drs. Ayub and Lacevic. Appellant now appeals the trial court's determination that Drs. Espinoza and Ayub were licensed physicians within the meaning of the statute and seeks to have the order of civil commitment vacated. We have jurisdiction pursuant to A.R.S. § 36–546.01 (2003).

## II.

¶ 7 To give context to the question before us, we set forth the pertinent aspects of the statutory scheme.

¶ 8 To begin a civil commitment proceeding, a "responsible individual" applies for a court-ordered evaluation of another. A.R.S. § 36–520(A) (2003). The application must set forth that the person is one who is, "as a result of a mental disorder, a danger to self or to others, persistently or acutely disabled or gravely disabled" and is intended for one "who is unwilling or unable to undergo a voluntary evaluation." A.R.S. § 36–520(A) & (B). The application must be made in the correct form and include the information prescribed by statute. A.R.S. § 36–520(B). Upon receiving this application, the screening agency must review the application and determine whether there is reasonable cause to believe that the person is a danger to self or others. A.R.S. § 36–521 (2003). If there is reasonable cause, the agency prepares and files a petition for court-ordered evaluation. A.R.S. § 36–521(D). That petition must contain certain elements, including the allegation of reasonable cause to believe that the person is a danger to self or others and the facts upon which that belief is based. A.R.S. § 36–523(A) (2003). The court then reviews the petition for evaluation and decides if reasonable cause does exist. A.R.S. § 36–529 (2003). If the court determines that reasonable cause does exist, the court orders an evaluation. A.R.S. § 36–529(B).

¶ 9 The court-ordered evaluation is "a professional multidisciplinary analysis based on data describing the person's identity, biography and medical, psychological and social conditions," and it must be "carried out by a group of persons consisting of not less than" either:

(a) Two licensed physicians, who shall be qualified psychiatrists, if possible, or at least experienced in psychiatric matters, and who shall examine and report their findings independently. The person against whom a petition has been filed shall be notified that he may select one of the physicians. A psychiatric resident in a training program approved by the American medical association or by the American osteopathic association may examine the person in place of one of the psychiatrists if he is supervised in the examination and preparation of the affidavit and testimony in court by a qualified psychiatrist appointed to assist in his training, and if the supervising psychiatrist is available for discussion with the attorneys for all parties and for court appearance and testimony if requested by the court or any of the attorneys.

(b) Two other individuals, one of whom, if available, shall be a psychologist and in any event a social worker familiar with mental health and human services which may be available placement alternatives appropriate for treatment.

A.R.S. § 36–501(11). It is this statute, and its requirement for "two licensed physicians", that is directly involved here. A "psychiatrist," as referenced in § 36–501(11)(a) is a "licensed physician who has completed three years of graduate training in psychiatry in a program approved by the American medical association or the American osteopathic association." A.R.S. § 36–501(34). A "licensed physician," in turn, is defined as "any medical doctor or doctor of osteopathy who is ... [l]icensed in this state." A.R.S. § 36–501(19)(a) (2003).[1]

¶ 10 If the evaluators believe that the person is indeed a danger to self or others, a petition for court-ordered treatment may be filed. A.R.S. § 36–531(B) (2003). This petition must allege that the patient needs treatment because he or she, "as a result of mental disorder, is a danger to self or to others, is persistently or acutely disabled or is gravely disabled." A.R.S. § 36–533(A)(1) (2003). It must also set forth the "appropriate or available" treatment alternatives and that the patient is unwilling to accept or incapable of accepting treatment voluntarily. A.R.S. § 36–533(A)(2) & (3). It must also be accompanied by affidavits of the two physicians who conducted the evaluation—in this case, Dr. Ayub and Dr. Lacevic (who was supervised by Dr. Espinoza)—and the affidavit of the applicant for the evaluation, if any. A.R.S. § 36–533(B). These affidavits must "describe in detail the behavior which indicates that the person, as a result of mental disorder, is a danger to self or to others, is persistently or acutely disabled or is gravely disabled" and must be based on the physicians' examination of the patient and study of information about the patient. *Id.* It is the statutory authorization on the part of Dr. Ayub (to conduct the examination) and Dr. Espinoza (to supervise Dr. Lacevic) that is the core issue here.

¶ 11 Finally, as to the statutory scheme, a hearing is held in which the evidence from the physicians, acquaintance witnesses, and the medical record of the person are considered. A.R.S. § 36–539 (2003). If the court finds by clear and convincing evidence that the person, "as a result of mental disorder, is a danger to self, is a danger to others, is persistently or acutely disabled or is gravely disabled and in need of treatment, and is either unwilling or unable to accept voluntary treatment," the court shall order the person to undergo inpatient or outpatient treatment or a combination of both. A.R.S. § 36–540(A) (2003). In making its decision, the court must "consider all available and appropriate alternatives for the treatment and care of the patient," and "order the least restrictive treatment alternative available." A.R.S. § 36–540(B).

---

1. One may also be a "licensed physician" if "licensed in another state" and serving full-time in a federal hospital. A.R.S. § 36–501(19)(b). The State does not claim this provision to be applicable here.

## III.

### A.

¶ 12 When interpreting statutes, we begin (and may also end) with the language of the statute itself. *See Arizona Dep't of Revenue v. Great W. Publ'g, Inc.*, 197 Ariz. 72, 74, ¶ 8, 3 P.3d 992, 994 (App.1999). In this case, the express statutory requirements take on added significance "[b]ecause involuntary treatment proceedings may result in a serious deprivation of appellant's liberty interests [.]" *Maricopa County Superior Court No. MH 2001–001139*, 203 Ariz. 351, 352, 54 P.3d 380, 382 (App.2002) (citing *In re Commitment of an Alleged Mentally Disordered Person, Coconino County No. MH 1425*, 181 Ariz. 290, 293, 889 P.2d 1088, 1091 (1995)). Accordingly, "statutory requirements must be strictly met." *Id.; Appeal in Pima County Mental Health Serv. Action No. MH–1140–6–93*, 176 Ariz. 565, 567, 863 P.2d 284, 286 (App.1993) ("Statutes providing for involuntary commitment on the basis of mental illness must be strictly construed.").

¶ 13 We believe that the plain language of the statute is dispositive of this case. However, even if it were not, the plain language combined with the purpose and context of the statute convince us that a physician with a "one year training permit" is different from a "licensed physician" for purposes of conducting mental health evaluations. We begin with the plain language of the statute.

### B.

¶ 14 The statutory language tells us that two licensed physicians must submit affidavits as part of the evaluation. A.R.S. § 36–501(11)(a). A "licensed physician" is statutorily defined as a medical doctor or doctor of osteopathy who is "licensed in this state." A.R.S. § 36–501(19). To qualify for a license to practice medicine in Arizona, a person must comply with the requirements set out in A.R.S. §§ 32–1422 to –1426. Those requirements include, among other requirements, graduating from an approved medical school and any one of the following: passing the three parts of the United States medical licensing examination, completing a fifth pathway program,[2] or being endorsed to practice.[3] A.R.S. §§ 32–1422, –1424, –1425, –1426.

¶ 15 The executive director of the Arizona Medical Board may also grant a "one year training permit" under A.R.S. § 32–1432.03. The director may grant this permit if the person participates in a program at an approved medical school or hospital,[4] pays a fee, and submits a written statement from the dean of the school or the chairman of the hospital's graduate medical education program. A.R.S. § 32–1432.03.[5] That statement

---

2. A "fifth pathway program" is for those "who attended a foreign school of medicine and successfully completed all the formal requirements to receive the degree of doctor of medicine except internship or social service, and [are] accordingly not eligible for certification by the educational council for foreign medical graduates". A.R.S. § 32–1424(A). It is a way to complete a medical education without having to complete an internship or social service obligation in the foreign country. Instead, the individual completes an "academic year of supervised clinical training provided in a medical school accredited by the LCME [Liaison Committee on Medical Education]." American Medical Association, "The Fifth Pathway Program," *at http://www.ama-assn.org/ama/pub/category/10255.html* (last visited January 28, 2004).

3. Licensure by endorsement is for those applicants that have already passed examinations in other American jurisdictions or Canada. *See* A.R.S. § 32–1426(A)(1). To be endorsed to practice, an applicant must meet the requirements found in either A.R.S. § 32–1422, § 32–

1423, or § 32–1424. In addition, an applicant must meet one of the following conditions within the prescribed time periods and with a minimum prescribed score: pass all three parts of the examination of the national board of medical examiners, pass a written examination administered by any American state, territory, or district or a Canadian province or the medical council of Canada. A.R.S. § 32–1426(A) & (B).

4. The approved school or hospital must also have an approved hospital internship, residency or clinical fellowship program. A.R.S. § 32–1432.03(1).

5. The text of A.R.S. § 32–1432.03 is as follows: The executive director may grant a one year training permit to a person who:
1. Participates in a program at an approved school of medicine or a hospital that has an approved hospital internship, residency or clinical fellowship program if the purpose of the program is to exchange technical and educational information.

must include, among other things, the name of a doctor who will "provide appropriate supervision of the participant" and a statement that the institution has advised the participant that he or she "may serve as a member of an organized medical team but *shall not practice medicine independently.*" A.R.S. § 32–1432.03(3)(c) & (d) (emphasis added).

¶ 16 Thus, according to the plain statutory language, the terms "license" and "permit" in this context are used to identify different kinds of authorization to practice medicine. A "permit" may be a form of a license, but it is clearly a qualified one. Further, even if considered a "license," it is qualified in a particularly significant manner with regard to civil commitment proceedings: the inability to practice *independently.* We note that the legislature provided for *residents* to conduct evaluations only when supervised. It made no provision for those with "one year training permits," such as Dr. Ayub, to conduct evaluations. Even more significantly, the legislature did not provide for a doctor with a "one year training permit" (as Dr. Espinoza here) to act as a "qualified psychiatrist" and *supervise* a resident (Dr. Lacevic) who was not authorized to conduct an evaluation on her own.[6] If the legislature intended for those with training permits to be authorized to conduct evaluations and supervise residents who were not allowed to conduct evaluations independently, it would have so provided.

¶ 17 In short, we do not believe the plain language of the statute permits a physician with a "one year training permit," who has

---

2. Pays the prescribed fee.
3. Submits a written statement from the dean of the approved school of medicine or from the chairman of a teaching hospital's accredited graduate medical education program that:
   (a) Includes a request for the permit and describes the purpose of the exchange program.
   (b) Specifies that the host institution will provide liability coverage.
   (c) Provides the name of a doctor of medicine who will serve as the preceptor of the host institution and provide appropriate supervision of the participant.
   (d) States that the host institution has advised the participant that the participant may serve as a member of an organized medical team but shall not practice medicine indepen-

by definition not completed the Arizona licensing requirements, to be considered a "licensed physician" in this setting.

### C.

¶ 18 To the extent the plain language is not sufficiently clear, we consider a broader range of factors to discern legislative intent and construe the statute. *Hobson v. Mid-Century Ins. Co.,* 199 Ariz. 525, 529, ¶ 8, 19 P.3d 1241, 1245 (App.2001) (stating that if language is ambiguous, "we then consider other factors such as the statute's context, subject matter, historical background, effects, consequences, spirit, and purpose"). Our review of the statutory scheme and its purposes, along with the fact that the statutory requirements must be "strictly met," *e.g., MH 2001–001139,* 203 Ariz. at 353, ¶ 8, 54 P.3d at 382, convinces us that a physician with a training permit does not fall within the definition of a "licensed physician" in this context. From the statutes we discern two major legislative concerns about those that perform these psychiatric evaluations: independence and qualifications.

¶ 19 First, the evaluators must be independent. The legislature provided that the person to be committed must be evaluated by no less than two licensed physicians, "who shall examine and report their findings *independently.*" A.R.S. § 36–501(11)(a) (emphasis added). In fact, the person to be evaluated has the right to choose one of those physicians, seemingly to ensure the independence of the evaluator. *Id.* Persons with training permits by statutory definition lack the inde-

---

dently and that this training does not accrue toward postgraduate training requirements for licensure.

6. We note that "licensed physicians" shall be "qualified psychiatrists, *if possible.*" A.R.S. § 36–501(11)(a) (emphasis added). Thus, "licensed physicians ... at least experienced in psychiatric matters" are required for purposes of performing the evaluation, but a "qualified psychiatrist" is optional. *Id.* When a psychiatric resident performs the evaluation, however, the requirement for the supervisor to be a "qualified psychiatrist" is mandatory. *Id.* ("a psychiatric resident ... may examine the person ... if he is supervised ... by a qualified psychiatrist[.]") The phrase "if possible" is dropped. *Id.*

pendence of a fully licensed physician. Critically, as mentioned above, those given training permits under A.R.S. § 32–1432.03 must be *supervised* by a medical doctor and *"shall not practice medicine independently."* *Id.* (emphasis added). We believe that to strictly meet the requirements of the civil commitment statutes, the person doing the evaluations must have the independence of being a fully licensed physician rather than being statutorily prohibited from acting independently.

¶ 20 Second, the evaluators must meet minimum standards of qualification: they must be licensed physicians and "qualified psychiatrists, if possible, or at least experienced in psychiatric matters." A.R.S. § 36–501(11)(a). Only one of the evaluators may be a psychiatric resident, and then only "if he is supervised in the examination and preparation of the affidavit and testimony in court by a qualified psychiatrist appointed to assist in his training." *Id.* Further, the supervising psychiatrist must be available for discussion with the parties' attorneys as well as for court appearances and testimony. *Id.*

¶ 21 In the case of *In re Maricopa County Superior Court No. MH 2002–000767*, 205 Ariz. 296, 69 P.3d 1017 (App.2003), this court discussed the role of the supervising psychiatrist when a resident performs an evaluation. In that case, the court held that, while supervising psychiatrists need not be physically present during the evaluation of the patient and preparation of the affidavit, the statute requires more than just general supervision. *Id.* at 298, ¶ 10, 69 P.3d at 1019. "The State must be able to show that the supervising psychiatrist actually provided some supervision of the resident in the examination of the patient whose treatment is at issue." *Id.* at 300, ¶ 17, 69 P.3d at 1021.

¶ 22 While we do not necessarily question the abilities of the doctors in this case, we believe that the legislature has set a minimum requirement for evaluators under the statute. They must be licensed physicians. We have no difficulty in seeing the legislature's wisdom, in a setting in which one's liberty is at stake, for setting a heightened, rather than relaxed, level of qualifications. If the qualifications are to be reduced to include a physician with only a "one year training permit," it is for the legislature to do so.

¶ 23 The State argues that the legislature left the formulation of the evaluation team "deliberately vague ... to provide for maximum flexibility with the composition of the evaluation team." Given the purposes above, we disagree. Additionally, "[t]he legislature is well aware that we have required parties to comply with [the statute's] provisions with exactness given the liberty interests at issue." *MH 2001–001139*, 203 Ariz. at 354, ¶ 15, 54 P.3d at 383; *see also Coconino County Mental Health No. MH 95–0074*, 186 Ariz. 138, 139, 920 P.2d 18, 19 (App.1996) ("Given the liberty interests implicated in a court-ordered treatment proceeding, a more liberal reading of section 36–533 is precluded."); *MH 1425*, 181 Ariz. at 293, 889 P.2d at 1091 ("Because [involuntary treatment] proceedings may result in a serious deprivation of liberty, however, the statutory requirements must be strictly adhered to.").

¶ 24 The State also argues that we may infer qualification from the fact that the physicians involved here have been performing these examinations routinely and their qualifications have never been questioned. In fact, as to one of the physicians here, the "one year training permit" has been renewed for four successive years.

¶ 25 That a practice has taken place, and even taken root, does not make it right. And it most certainly does not change the language of the statute. *See MH 2002–000767*, 205 Ariz. at 299, ¶ 15, 69 P.3d at 1020 (citation omitted) ("The statutory requirements are not necessarily based on the standards of the medical profession."). We do not know the reason why physicians with a "one year training permit" have been permitted to renew those permits for successive years and are routinely called upon to act as evaluators in civil commitment proceedings. The record does not address this.[7] It concerns us, how-

---

7. Of interest, and unaddressed by the parties, is the statutory provision of A.R.S. § 32–1432.02 (2002). This statute provides for "a one year *renewable* training permit." *Id.* (emphasis add-

ever, rather than comforts us, that this practice should be utilized as a basis to interpret the statute when the text of the statute deals with a substantial deprivation of liberty and calls for an evaluation by two "licensed physicians" working "independently."

¶ 26 The practice that has apparently developed in the mental health community, which allows those with a "one year training permit" to act under A.R.S. § 36–501(11), is in violation of the statute. We are not being asked to address the consequences of such a practice as to *prior* cases in which the issue was not raised, but we address it as to this case and future cases: this practice is not permissible under the terms of the present statute. If the legislature wishes to permit this practice in the future, by amending this statute, it may certainly do so. That, however, is a legislative function rather than a judicial one.

ed). The training permit under which Drs. Espinoza and Ayub are acting is issued pursuant to A.R.S. § 32–1432.03, and is not specifically designated in the statute as "renewable." Thus, the renewability of a training permit is specifically

*Conclusion*

¶ 27 Because we find that a physician authorized to practice medicine in Arizona as the holder of a "one year training permit" under A.R.S. § 32–1432.03 is not a "licensed physician" within the meaning of A.R.S. § 36–501, we reverse the ruling of the trial court and vacate the order for court-ordered treatment.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge and DONN KESSLER, Judge.

authorized for one type of training permit, but not for another.